[No. 24757. Department Two. November 23, 1933.]

WHITE & BOLLARD, INC., *Appellant,* v. STANDARD
ACCIDENT INSURANCE COMPANY, *Respondent.*[1]

*James Tynan,* for appellant.

*Battle, Hulbert & Helsell,* for respondent.

GERAGHTY, J.—This is an action brought by the
plaintiff, White & Bollard, Inc., against defendant,
Standard Accident Insurance Company, upon a fidel-
ity bond. From a judgment in favor of the defendant,
entered upon a directed verdict, the plaintiff appeals.

On June 18, 1931, the respondent executed and de-
livered to appellant a fidelity bond covering certain
of its employees, including Mrs. Edna P. Jacobson,
its cashier. Under the terms of the bond, the respond-
ent agreed to pay to the appellant the amount of any
pecuniary loss it might sustain, not exceeding five

[1]Reported in 27 P. (2d) 123.

thousand dollars, through any act of fraud, dishonesty, forgery, theft, larceny, embezzlement, misappropriation, wrongful abstraction, or willful misapplication committed by any of its employees covered by the bond.

Mrs. Jacobson had been the appellant's cashier for twelve years. On September 18, 1931, she took a vacation, and during her absence it was discovered that her accounts were short in a sum over five thousand dollars.

The appellant is loan agent in the city of Seattle for the Prudential Insurance Company of America, of Newark, New Jersey, and, as such, collects and transmits to its home office payments on principal and interest made by borrowers on account of mortgages held by the Prudential. In addition to the Prudential account, the appellant does a general mortgage and loan business. In relation to the Prudential account, a practice had obtained in appellant's office of receiving installments of principal in advance of the interest-maturing dates on which the Prudential would accept such payments. The sums so paid would be held by appellant to its own account, and interest allowed until the date when the money was to be remitted to the home office.

On September 2d, A. D. Hicks, who had a loan with the Prudential, came to the office of appellant and gave one of its officers a check for $5,025. Of this sum, five thousand dollars was to be held by appellant for a principal payment on his mortgage in November, and twenty-five dollars was paid him in cash. The check was, by the officer who received it, delivered to the cashier. She paid Hicks twenty-five dollars and deposited the remainder in the bank account of appellant, but, instead of crediting the payment to Hicks,

caused it to be entered on the books as being made by Alice Johnson.

Alice Johnson had, on the previous day, given appellant, on account of a Prudential loan, several checks aggregating $5,025. These checks were deposited to the account of the Prudential by the cashier, but, instead of crediting them to Alice Johnson, she credited them to the accounts of some seventy-two other persons who had theretofore made payments on account of Prudential loans, for which she had not given them credit. As the Johnson payment was made by several checks, she deposited the checks on different days, in order to make the transaction appear more in the course of business. On April 3d, one John Reuter paid appellant $650.97, which the cashier also deposited, but credited to five other persons who had made prior payments for which she had not given them credit.

In other words, some seventy-seven persons who had theretofore paid various sums for which they had not been given credit were credited with the Johnson and Reuter payments, and Mrs. Johnson was in turn given credit for the payment made by Hicks.

In making its case, the appellant did not attempt to trace the shortages beyond the seventy-seven items covered by the Johnson and Reuter payments, and rested upon the case made with the showing of the misapplication of the Johnson, Reuter and Hicks payments, claiming a recovery specifically upon the misapplication of the Hicks payment.

The respondent's principal witness was Mrs. Jacobson, the defaulting cashier. She acknowledged receipt of the Hicks, Johnson and Reuter payments and their application as here detailed. She testified that the Johnson and Reuter checks were used to cover up the seventy-seven prior shortages on account of payments

made by persons who had not been properly credited with them, and, in further explanation of the defalcation, she testified that, beginning in the latter part of 1926 and for some two years thereafter, she had embezzled various sums aggregating over six thousand dollars; that she had taken the money to help out her husband, who was engaged in business; that she procured a divorce from him in 1929, and thereafter took none of her employer's money, but continued to cover up the shortages by applying payments made in advance, as in the Hicks case, for illustration, to balance prior shortages.

The appellant assigns four errors, but in view of our disposition of the case we will discuss only the first two: (1) That the court erred in acting as the trier of the facts in the case and in directing the jury to return a verdict for the respondent; and (2) that the court erred in holding that, when the cashier took the money paid to appellant by A. D. Hicks and paid the same to the Prudential Insurance Company, she did not thereby misappropriate the funds of the appellant.

In a memorandum opinion filed by the trial judge, he announced he had reached the conclusion that a *prima facie* case in favor of appellant had not been made out, for the reason that there was no showing that the appellant had lost any money by the misapplication of payments made—either that made by Hicks or by Johnson; that the appellant was not in any different financial condition after those accounts had been collected and put in the bank and credited to the wrong accounts than it was before. In other words, that appellant did not lose anything at the time those payments were made, and, not having lost, could not recover. In arriving at this view of the law, the court accepted as controlling a line of authorities,

of which *Royal Indemnity Co. v. American Vitrified Products Co.,* 117 Ohio St. 278, 158 N. E. 827, 62 A. L. R. 407, is illustrative.

We are not disposed to follow these authorities, but rather the doctrine announced in *American Bonding & Trust Co. v. Milwaukee Harvester Co.,* 91 Md. 733, 739, 48 Atl. 72. In this case, the court, in passing upon a state of facts very similar to the facts in the case at bar, says:

"The discussion of this point must therefore be narrowed to the inquiry whether the fact that the money collected by the agent was paid to the plaintiff, although on accounts other than those so collected, relieved the agent of embezzlement and the defendant of liability . . .

"Independent of authority we cannot understand how the position of the appellant can be successfully maintained. If Brumbaugh had fraudulently converted this money to his own use by paying it to some creditor other than the plaintiff, there could be no question as to the responsibility of the bonding company, and upon what principle can it be relieved merely because he so used it in payment of other debts he owed the plaintiff? . . .

"If, then, we were without authorities on the subject we would have no difficulty in reaching the conclusion that the defense intended to be relied on under this plea is not well taken, but those reflecting on the question are not wanting. In *Frownfelter v. State, use County Commissioners,* 66 Md. 80 [5 Atl. 410], the suit was on a tax collector's bond. The collector had applied part of the money which he had collected, for the year for which the bond was liable, to his defalcations for previous years and the sureties contended that that could not be done and they still be liable. This Court said, on page 87 [66 Md. 80, 5 Atl. 410]: 'If the commissioners or the treasurer knew that the money applied to the taxes due for previous years had been collected on the levy of 1881, certainly they would have had no right to permit such application. But in the absence of any knowledge of

the sources from which it was obtained, it is difficult to see how they could have prevented Myers from applying it to his indebtedness for any year which he might name. When the money was in his possession there was nothing to identify it or to distinguish it from other funds under his control, or rightfully belonging to him. The obligation assumed by his sureties was that he should pay the money in discharge of the tax levied, within the time required by law. If he paid it in discharge of previous taxes, it was as much a breach of his bond as if he had retained it in his own pocket. We think the law on this point is correctly stated in *Inhabitants v. Bell,* 9 Metcalf [Mass.] 499, and in *Gwynne v. Burnell,* 7 Clark and Finnelly 572.' In the case last cited there were several opinions filed to the same effect, but Baron Gurney thus tersely stated his conclusions: 'The application of any part of the money collected under the assessments of that year, to cover any deficiency in any former year, is just as much a breach of his duty and a forfeiture of his bond as if he had paid the money to any other creditors or lost it at the gaming table.' To the same effect are *State v. Sooy,* 39 N. J. L. 539; *Com. v. Knettle,* 182 Pa. 176 [38 Atl. 13]; *County of Pine v. Willard,* 39 Minn. 125 [39 N. W. 71]; *Crawn v. Com.,* 84 Va. 282 [4 S. E. 721]; *Rogers v. State,* 99 Ind. 218; *Stone v. Seymour,* 15 Wend. 19; *Hecox v. Citizens' Ins. Co.,* 2 Fed. Rep. 535; *State v. Smith,* 26 Mo. 226. Those cases in nowise conflict with the general principles applicable to sureties, such as that they are only liable for defaults, etc., during the time the bonds are in force, but they hold that default is made by the application of money collected under the terms of the bond to the payment of other debts, even if such debts are due the obligee of the bond, provided, of course, he is not a party to its misappropriations and has no knowledge of it.''

The doctrine of this case was explicitly adopted by this court in *State v. Bogardus,* 36 Wash. 297, 78 Pac. 942. In that case, Bogardus, who was secretary of a building and loan association and short in his accounts,

had covered up his shortage by following a system similar to the one followed in this case. As in this case, it was argued that there was no shortage or misapplication of funds, because the last collection applied to cover up a prior shortage left the association in the same financial condition in which it was before. In disposing of this contention, the court said:

"When appellant received the check for $2,046.67, and deposited it to the credit of the society for the purpose of covering up his own shortage, already existing to that amount, he thereby converted it to his own use. The fact that he made no entry upon the books of the society of the amount received was evidence of a fraudulent intention. *State v. Baumhager,* 28 Minn. 227, 9 N. W. 704; *State v. Trolson,* 21 Nev. 419, 32 Pac. 930; *Bowman v. Brown,* 52 Iowa 437, 440, 3 N. W. 609; *Spalding v. People,* 172 Ill. 40, 49 N. E. 993; *American Bonding etc. Co. v. Milwaukee etc. Co.,* 91 Md. 733, 48 Atl. 72.

"Suppose that appellant had taken this check for $2,046.67, or any part of it, and paid it to some third party without the knowledge and consent of the society, in liquidation of a personal debt owing by appellant to such third party; such misappropriation of the fund would amount to embezzlement, because the payment of the fund upon his private account would be a fraudulent conversion of such fund to his own use. The fact that appellant paid the money to the society for his own use, in such a way as to liquidate a debt really owing but unknown to the society, is not capable of reasonable distinction from the supposed case."

Respondent argues that the *Bogardus* case is not authority here, because that was a criminal action. But the principle involved is the same. Bogardus was convicted of embezzling money intrusted to him by his employer, the building and loan association. The court held that the embezzlement was complete, although the specific money he was accused of embez-

zling remained in the association's accounts. The embezzlement consisted in so entering the money deposited with him as to cover a prior shortage. And so it is in the case at bar. When Mrs. Jacobson took the Hicks payment and deposited it, not to the credit of Hicks but to the credit of Alice Johnson, in order to cover up her own shortage, she had committed, with respect to her employer, an unlawful defalcation and misapplication of its funds.

To say that the transaction involved no pecuniary loss to the appellant, such as would entitle it to recover from respondent under its bond, implies too narrow and technical a view of the contract made by the parties. Fidelity bonds, being contracts of indemnity against loss, are to be liberally construed in favor of the object sought to be attained. When the Hicks payment was made to appellant to be held until the November payment should be made to the Prudential, and Mrs. Jacobson took the money and applied it on the Alice Johnson debt to the Prudential, there was a loss to appellant. When the Hicks payment had to be remitted to the Prudential in November, the money he had paid was not on hand to make it, because it had been applied to pay another debt.

We concede it to be the law that the obligation of the contract here involved was not retroactive. The respondent could not be held under it for any shortage occurring before its execution. But the fact that a shortage accruing within the term covered by the bond was superimposed upon a groundwork of prior shortages does not attach to the later shortage the legal status of the earlier.

As we said at the beginning of this opinion, the trial court's view of the law finds strong support in numerous cases cited in respondent's brief, but we are disposed to follow the other view of the law, as being

more consonant with justice and more certain in its application.

The case should have been submitted to the jury under proper instructions. The judgment of the lower court is reversed, and the case remanded for a new trial in accordance with the views expressed in this opinion.

BEALS, C. J., TOLMAN, HOLCOMB, and BLAKE, JJ., concur.